(139 App. Div. 437.)

### BELDEN v. BELDEN et al.

(Supreme Court, Appellate Division, First Department. July 7, 1910.)

1. ASSIGNMENTS (§ 64*)—VALIDITY—FRAUD AND UNDUE INFLUENCE—EVIDENCE.

   In a suit to set aside an assignment by one brother to another of an interest in a waterworks enterprise on the ground of fraud and undue influence, findings for defendant *held* against the weight of the evidence.

   [Ed. Note.—For other cases, see Assignments, Cent. Dig. § 125; Dec. Dig. § 64.*]

2. ASSIGNMENTS (§ 64*)—VALIDITY—FRAUD AND UNDUE INFLUENCE—BURDEN OF PROOF.

   One who through dominating influence has induced a physically and mentally feeble brother to assign his sole possession has the burden to show good faith and fairness.

   [Ed. Note.—For other cases, see Assignments, Cent. Dig. § 125; Dec. Dig. § 64.*]

3. EVIDENCE (§ 97*)—BURDEN OF PROOF—FRAUD—EFFECT OF FIDUCIARY RELATION.

   When fraud or undue influence is charged, and a fiduciary relation is shown prima facie, the burden shifts to the fiduciary to show good faith.

   [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 112, 113; Dec. Dig. § 97.*]

Appeal from Special Term, New York County.

Action by George G. Belden, Henry Belden's administrator de bonis non, against William Belden and others. From a judgment dismissing the complaint, plaintiff appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Chàrles L. Craig (Augustus Van Wyck, on the brief), for appellant.
Dos Passos Bros. (John R. Dos Passos, of counsel), for respondents
William Belden and Anna Belden.

CLARKE, J. Henry Belden had for a number of years endeavored to promote a. scheme for furnishing Jersey City with water. September 6, 1898, an agreement in writing was entered into between Patrick H. Flynn and Henry Belden, which recited:

"Whereas, the said party of the second part (Belden) has rendered to said party of the first part valuable aid and assistance in preparing and devising plans, and in acquiring options and easements for a new water supply for Jersey City, N. J., in accordance with the published advertisement for bids made by the city, in answer to which the said party of the first part did * * * submit three several proposals to said city, which services were mainly contingent for reward upon the acceptance of one of said proposals by the city, * * * it is agreed between the said parties, that in case any contract shall be awarded to the said party of the first part by the municipal authorities of Jersey City, or to any company in his interest upon any of the proposals submitted as aforesaid, or any modification thereof, then the said party of the first part shall pay to the said party of the second part or his assigns, the sum of $300,000 in cash in manner following: * * * "

Upon the same day they entered into a supplemental agreement, under which Flynn agreed to pay to Belden from time to time one-fourth of the net profits in cash, stock, and bonds as the case may be, arising out of said enterprise and the work performed in pursuance thereof. It was further agreed that, in case said contract when awarded should be assigned to and carried out in the name of a corporation, then the aforesaid payments should be assumed and performed by said company. Flynn's proposal was accepted by the municipal authorities of Jersey City, and the contract was formally executed on February 28, 1899.

On March 1, 1899, Belden entered into a written agreement with William B. Edwards, which recited that:

"Whereas the said parties hereto have been associated in preparing and devising plans and in acquiring options and easements for a new water supply for Jersey City in connection with Patrick H. Flynn, to whom a contract has recently been awarded by Jersey City," Belden assigned to Edwards one equal undivided one-half part of the two agreements heretofore recited between Belden and Flynn and of the moneys, profits, cash, stocks, and bonds due and to grow due thereunder.

That agreement contained the further clause:

"In case of the death of either party hereto before the final settlement and payment to them of all said moneys, profits, cash, stock and bonds under said two agreements, then the survivor shall have the sole right of making such settlement and receiving such payment, subject always to the obligation on his part of paying over one-half the net proceeds thereof to the legal representative of the deceased party or to his assigns, if he shall have assigned the same, or any part thereof."

On April 26, 1899, the Jersey City Water Supply Company was organized under the laws of the state of New Jersey for the purpose of taking over the said contract between Flynn and the mayor and aldermen of Jersey City, and thereafter the said contract was assigned

by Flynn to said company, and in consideration thereof the company issued to Flynn $1,000,000 of its capital stock, and Flynn caused to be transferred to Henry Belden 1,250 shares of said stock of the par value of $100 each in pursuance of his contracts with Belden.

On August 17, 1899, Henry Belden executed and delivered to his brother, William Belden, the following paper:

"This indenture, made this 17th day of August, 1899, between Henry Belden of the borough of Manhattan, city and state of New York, of the first part, and William Belden of the same place of the second part, witnesseth: For and in consideration of the sums heretofore advanced and lent by the party of the second part to the party of the first part, and in consideration of one dollar to me in hand paid, and services to be hereafter rendered by the party of the first part to the party of the second part, doth hereby sell, assign, transfer and set over unto the party of the second part, his heirs and assigns, all and every interest and right now due or hereafter to become due to him, and all rights and interests which may accrue thereunder in the agreement, a copy of which is hereto annexed marked 'B,' the said party of the second part being hereby substituted in the place and stead of the party of the first part so far as any interest may, can or shall exist or arise to the party of the first part, giving and granting unto the party of the second part all power and authority to enforce and carry out said contract in such manner as the party of the second part shall deem proper, substituting him in my place and stead in the same manner as if I should personally do the act. My services under said contract to continue in the same manner as though I were still carrying out the contract.

"Witness my hand and seal this 17th day of August, 1899.

"Henry Belden. [L. S.]

"Witness:  C. Donohue."

Annexed to said agreement were copies of the agreement between Flynn and Henry Belden, dated September 6, 1898, heretofore referred to.

At the same time Henry Belden executed a will which had been drawn by the C. Donohue who drew and witnessed the paper purporting to assign all of Henry's interests in the Flynn contracts to William Belden, and it was executed in his office, and he became one of the witnesses. The will is as follows:

"I give, devise and bequeath unto my executors hereinafter named, all of my estate of every name, kind and description, to have and to hold the same unto William Belden, Charles D. Belden and Henry Belden, Jr., my son, to them and their heirs forever. I hereby appoint the said William Belden, Charles D. Belden and Henry Belden, Jr., my executors and trustees under this will without any security on their part. I hereby revoke all other and former wills by me made, and declare this to be my last will and testament."

Although the paper of August 17, 1899, purported to assign to William all and every interest that Henry had in the Flynn contracts, it was not until the 13th of September, 1901, that the shares of stock in the Jersey City Water Supply Company were transferred to William. February 24, 1902, William Belden made a settlement with Flynn under which Flynn was to pay $100,000 and agreed to pay one-fourth of the net profits that Flynn should thereafter receive from the said water contract and enterprise.

On August 31, 1902, Henry Belden died, leaving a widow and children. William Belden received the $100,000, $25,000 of which he paid

to one Record for bringing about the compromise and settlement, but no part of which did he pay to Henry Belden before his death. The will heretofore alluded to was probated; but an action was subsequently begun in the Supreme Court which resulted in a judgment that the will was invalid, which judgment was unanimously affirmed in this court. Belden v. Belden, 120 App. Div. 876, 105 N. Y. Supp. 1106.

The action at bar was brought by the son of Henry Belden, as administrator de bonis non, to have the alleged assignment of August 17, 1899, declared to have been executed without any valuable consideration through the fraud and undue influence of the defendant William Belden, or that the same was part of a transaction creating a valid trust in favor of plaintiff's intestate, and that the defendant William Belden was and is the trustee of plaintiff's intestate, and to compel a discovery and an accounting, and for other appropriate relief.

The learned trial court has resolved the questions of fact against the plaintiff. We have examined the large record with great care, and have reached the conclusion that the findings of fact are against the weight of evidence.

Henry Belden had devoted himself for years to the particular enterprise which finally met success in the contracts entered into by Flynn and the municipal authorities of Jersey City, and Flynn and himself, and yet neither Henry Belden nor his family received any of the $100,000 paid upon those contracts, and, if this judgment is right, can never hope to obtain anything thereon.

There is no doubt that towards the end of his life Henry Belden was broken in health and enfeebled in mind. He suffered from terrible convulsions, and at his death he was afflicted with general paresis. His older brother, William, seems to have been a strong and vigorous man, who dominated and controlled him. It seems to us that Henry executed the paper of August 17, 1899, upon the inducement of his brother, but for his own benefit, in the belief that William's health and strength and ability would be devoted to procuring an advantageous settlement of his claim. The proof satisfies us that to the time of his death Henry Belden remained of the opinion that he still owned this claim and that William was simply representing him and working for his interests.

We think the proof also sufficiently supports an inference from the facts proven that William deliberately and designedly, by misrepresentation and by exercise of dominance over his sick and weak brother, obtained the result of his many years of work for himself. Henry's will, which has been declared invalid by the court, William procured to be drawn by his own counsel as a part of the transaction out of which the assignment grew. The fact that the stock was not transferred until 13 months after the assignment; the fact that William caused a revocation to be made by Henry of the last clause of his agreement with Edwards, heretofore alluded to, under which the survivor of the two parties to that contract was to act for the decedent and in his interest; the proof of many statements made by William to indifferent

witnesses that he had no personal interest in the Jersey City Water Company affairs, but was solely looking after the interests of his brother Henry; the failure to prove any adequate consideration for this transfer to William of all that Henry had in the world to the exclusion of his own immediate family; the concealment of the efforts to compromise; the fact that a very substantial settlement had been made; the correspondence between William and his brother Charles, which gives a clear picture of Henry's physical and mental condition and illustrates the attitude of his two brothers towards him— are some of the matters which persuade us that the learned court did not draw the correct conclusion from the evidence submitted.

When it is shown that a younger brother, sick and feeble with weakened mentality, has been stripped of his sole possession by an instrument suggested by a strong and dominating elder brother and drawn by his personal counsel, it seems to us that the burden is upon the beneficiary of satisfying the court of his good faith and entire fairness.

The will was an extraordinary one. A layman might readily suppose that it created a trust. As matter of fact it gave, devised, and bequeathed the testator's entire estate absolutely to his two brothers and one of his sons, the executors and trustees named therein. At the time of its execution, all testator had was his rights under the water supply contracts. The making of the will was urged by William Belden's counsel. He wrote to Henry:

"I enclose you form of will. It is short but you may depend on it contains everything that is in any way needed."

And again:

"What have you done about the will as suggested by me? If you should leave without a will your wife would have the right to administer. Do not forget that."

The force of that reminder lay in the fact that Henry and his wife for many years had been living separate and apart. But at the very time that the will, suggesting to a lay mind the creation of a trust of all that he might leave, was being urged upon him, the assignment had been contemporaneously executed. This assignment is claimed by the defendant to have been absolute and unconditional and upon adequate consideration. It describes itself as an "indenture" between Henry Belden as party of the first part and William as party of the second part, but was signed by Henry alone. It uses this language:

"For and in consideration of the sums heretofore advanced and lent by the party of the second part to the party of the first part, and in consideration of one dollar to me in hand paid and services hereafter to be rendered by the party of the first part to the party of the second part." And "my services under said contract to continue in the same manner as though I were still carrying out the contract."

Is it conceivable that a simple assignment of interest in a contract for an expressed past consideration of money advanced and loaned would enumerate as part of the consideration which would naturally proceed from the assignee "and services hereafter to be rendered" by the assignor to the assignee, and the further specific provision "my services under said contract to continue in the same manner as though

I (the assignor) were still carrying out the contract"? If these two instruments, the will and the assignment, had been drawn by Henry Belden, they would have furnished convincing proof of his mental unsoundness. But they were not his work. His hand, indeed, signed them. But they were the product of two shrewd adroit minds with a purpose. That purpose was to persuade Henry that he was doing one thing, while in fact it was another. We have no doubt that he believed that he was merely giving William the power to act for him and in his interests. His own subsequent declarations, acts, and letters, as well as William's statements to him and others, are consistent with this theory, and this theory alone. An absolute assignment for an expressed consideration, witnessed and under seal, would be a formidable instrument to seek to avoid. But when by its own internal evidence it proves that is not what it seems, that it was designed to fool and deceive, we find it marches with the other testimony to establish a fraud upon one who should have been the object of brotherly solicitude and care. Even assuming that William had made some advances, it was unconscionable to take from his dying brother the entire results of his years of anxious and heartbreaking and finally successful work, for Henry died August 31, 1902, still believing William was looking after his interests. He wrote to William as late as August 2, 1902:

"Would very much like to get a line from you regarding my business affairs that have been placed in your hands."

Yet William claims that Henry, knowingly and for adequate consideration, had absolutely assigned to him all he had on August 17, 1899. William had made the settlement, by which he was to receive and did receive from Flynn $100,000 on February 24, 1902, five months before Henry's death. It is most significant that he concealed this fact from Henry and flatly denied that it had taken place to Henry's family.

In a court of equity the relation of the parties and their comparative condition is of the utmost importance, and, when a prima facie case is made of a fiduciary relation, the burden is shifted to the fiduciary to satisfy the conscience of the court. Then the doctrine of uberrima fides becomes applicable. There can be no doubt that a prima facie case was established, because at the close of plaintiff's case there was no motion made to dismiss the complaint.

We are aware that the learned court at Special Term had the benefit of seeing and hearing the witnesses, and we would not lightly interfere upon a question of fact in view of that advantage. Nevertheless, a close study of this record, of which we have indicated but a few salient facts, convinces us that we should not affirm the judgment appealed from.

The judgment is, therefore, reversed, and a new trial ordered, with costs and disbursements to the appellant to abide the event. All concur.