BLANCHE R. JOTHANN, Plaintiff, *v.* IRVING TRUST COMPANY, Defendant.

Supreme Court, New York County, March 14, 1934.

*Minton, Murphy & Mara,* for the plaintiff.

*Gould & Wilkie,* for the defendant.

SHIENTAG, J. The plaintiff, at the time an unmarried woman and a stranger in New York city, with little business experience, called upon a representative of the defendant whose duty it was to arrange for the creation of trusts. She had some 2,370 shares of Detroit Bankers stock valued at about $200,000, which she wanted to use as the corpus of the trust.

Before the negotiations leading up to the execution of the trust agreement, plaintiff had opened a checking account at one of the local branches of the defendant and obtained a loan there. For the purpose of having her will drawn, she had consulted the trust officer with whom later she had the negotiations for the creation of the trust. This trust officer, a Mr. Holden, was not an attorney. He asked her if she knew any lawyers in New York. On being informed that she did not, the trust officer recommended a well-known and highly reputable firm of attorneys, to whom he transmitted plaintiff's wishes and instructions, and who prepared her will for her. She never met these attorneys or any one from their office and never communicated with them directly. The will itself was executed in the office of the bank. The attorneys who drafted the will sent with it a statement of instructions as to how it was to be executed, together with an advice to the plaintiff that they would be glad to confer with her about it if she so desired. Plaintiff, however, did not avail herself of this opportunity   In the preparation and execution of the will she relied on Mr. Holden, the defendant's representative, in whom, obviously, she had confidence.

After the will was drawn, the plaintiff again turned to Mr. Holden for advice in connection with the creation of the trust. She appreciated the dangers of speculation in stocks and wanted to create an irrevocable trust so that she would strip herself of all power in connection with its ministration. Her desire was to protect her prospective husband and certain close relatives. The Detroit Bankers stock, which she wanted to use as the basis of the trust, constituted the bulk of her assets. At various times she discussed with Mr. Holden the details of the trust agreement. She wanted the holdings in the trust diversified. She was particularly anxious to avoid investment in bank stocks because she feared the possibility of a double liability assessment. The defendant's trust officer represented to her that the stock which she then owned was not a suitable investment to be held in a trust; that he did not consider that there were any circumstances which would justify a woman in retaining her entire investment in bank stocks. Accordingly, he submitted to her a list of investments of the type which he thought could with wisdom be purchased for the purposes of the

trust. This list did not contain any bank or common stocks, but it did include securities which were not legal investments for trust funds.

Plaintiff was told that if she deposited her Detroit Bankers stock with the defendant, it would sell the stock and reinvest the proceeds in well-diversified securities, including real estate mortgages, high-grade bonds and preferred stocks, but no investments would be made in bank or in common stocks. The details having been agreed upon, the defendant's representative undertook to have the trust agreement prepared. He had this done by the same firm of attorneys that had previously drawn the plaintiff's will. Here again the plaintiff did not meet the attorneys and had no personal communication with them. She did not obtain any independent advice with respect to the creation of the trust. After the agreement had been prepared it was executed in the office of the bank on January 20, 1931. It contained, among others, the following provisions:

" *Second.* The Trustee is hereby authorized to hold in its discretion as continuing investments all the stocks, bonds and other securities described in Schedule A and such as may be added thereto, or to sell the same and to invest and reinvest the proceeds thereof in such stocks and bonds or other securities as it may deem best, without limitation to securities of the kind in which trust funds are permitted by law to be invested, and the Trustee is relieved from all liability by reason of the retention of any securities set forth in Schedule A, or which may be hereafter deposited hereunder by the Grantor."

" *Thirteenth.* The Trustee shall not be liable for any acts or things done, suffered or omitted in the exercise of good faith and without wilful default or neglect."

The defendant held the Detroit Bankers stock for a long time and it was finally disposed of at a considerable loss. Plaintiff, after the execution of the trust agreement, requested the defendant to withhold the sale of the bank stock until after it was ex dividend on March 20, 1931. Thereafter she gave no instructions concerning the disposition of the securities she had deposited.

Plaintiff now seeks to have the trust agreement reformed so as to incorporate therein the true agreement, which she alleges she understood had been entered into and which she believed to have been incorporated in the instrument she executed. That the trust agreement was signed by the plaintiff in consequence of a genuine mistake on her part as to some of its essential terms is clearly established by the evidence. The explanation which the trust officer is alleged to have given her concerning the contents

of the instrument, was superficial and entirely inadequate. She did know that it was proposed to give the trustee power to reinvest in " non-legal " as well as " legal " securities. She had every right to assume, however, that the instrument she was signing provided for the sale of her bank stock; she had every right to assume that it contained no special limitation of liability on the part of the trustee for the administration of the trust.

The instrument she signed was not in accord with the understanding she had arrived at with Mr. Holden. She had agreed, and thought the instrument she signed so recited, that her bank stock was to be sold and the proceeds reinvested in diversified securities of the kind indicated by Holden. The trust agreement, instead, permits the trustee in its discretion to hold the entire bank stock as a trust investment, and materially restricts the liability of the trustee in the event of loss. That was not what the plaintiff had bargained for and the defendant knew it.

The defendant did not sign the agreement as the result of any mistake on its part. The mistake was not mutual. The defendant well knew, however, that the agreement embodied in the instrument was not that which had been discussed with the plaintiff and which she had every right to assume she was entering into. The defendant in the light of all the circumstances should have known that the plaintiff was signing in consequence of a mistaken understanding of what the written trust agreement actually provided. Such conduct, under the conditions here presented, requires the reformation of the contract to express the true understanding of the parties.

To entitle the plaintiff to relief on this branch of the case, it is not necessary to show that the conduct of the defendant was tainted by any evil design or that it involved moral obloquy. This is not a case where the parties dealt at arms' length. We have here a relationship of trust and confidence between the parties, a fiduciary relationship which, with all its consequences, was called into being not for the first time upon the execution of the agreement, but in the course of the negotiations leading to its preparation. In such a case the courts will grant relief where there is what has been graphically, if not accurately, termed " constructive " fraud. A court of equity in effect says to a fiduciary: " It is true that you have had no evil intention to do a wrongful act, but the consequences of your conduct would be so unfair, so unconscionable, that we will not permit you to take advantage of the dependence, the weakness of the one who relied upon you and who trusted you to protect and safeguard her interests."

Relief will be given to the injured person upon proof that advan-

tage was taken of the relationship of trust and confidence. (*Carr* v. *National Bank & Loan Co.*, 167 N. Y. 375; *Fisher* v. *Bishop*, 108 id. 25; *Cowee* v. *Cornell*, 75 id. 91; *Belden* v. *Belden*, 139 App. Div. 437.)

"A trustee is held to something stricter than the morals of the market place. Not honesty alone but the punctilio of an honor the most sensitive, is then the standard of behavior." (*Meinhard* v. *Salmon*, 249 N. Y. 458, 464.)

Constructive fraud, or a fraud of which equity takes cognizance, does not necessarily involve any evil or corrupt intention or imply that the transaction was conceived in iniquity.

" The plaintiff has been made to suffer her loss through misplaced confidence in one whom she believed to be devoted to her interests, while, at the time, he was acting for the defendant's, and the legal theory of her right to equitable relief, by the way of rescission, rests upon the basis that Sherman undertook to act as the agent of both parties in a matter where their interests were, for obvious reasons, to be regarded as conflicting. In such cases equity will, upon the seasonable application of the party, avoid the transaction and this right is conceded, without reference to any actual fraud." (*Carr* v. *National Bank & Loan Co.*, 167 N. Y. 375, 379.)

In equity the court looks to the relationship of the parties — the reliance, the dependence of one upon the other. Where a relationship of confidence is shown to exist, where trust is justifiably reposed, equity scrutinizes the transaction with a jealous eye; it exacts the utmost good faith in the dealings between the parties, and is ever alert to guard against unfair advantage being taken by the one trusted. (*Wendt* v. *Fischer*, 215 App. Div. 196; *Nekarda* v. *Presberger*, 123 id. 418.) Of course, parties may contract themselves out of their legal liabilities; they may do so when they deal at arms' length; they may do so when they deal on terms of equality; they may even do so when there is a fiduciary relationship, but in that event equity proclaims its *caveat* to the one trusted, in accents clear and unmistakable, that it must be under such circumstances as to indicate that " no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood." (*Cowee* v. *Cornell*, 75 N. Y. 91, 100.) Notwithstanding the forms which were followed, it must in all candor be said, that the plaintiff actually received no independent legal advice in connection with the preparation or execution of the trust agreement in controversy. She did not have the benefit of independent counsel, devoted solely to her interests, in explaining the significance and the legal and practical effects of the instrument she signed. She was entitled to actual rather than absentee counsel and advice.

Holden, an employee of the defendant, was in effect acting in a dual capacity, attempting to serve two principals with conflicting interests.

The trust agreement will be reformed in the following respects:

*First.* There will be stricken therefrom the limitation of liability of the trustee for the administration of the trust, contained in paragraph " thirteenth " of the agreement. That will leave the common-law rule of liability applicable.

*Second.* Paragraph " second " of the agreement will be changed to provide that the trustee shall sell the securities deposited under the trust and reinvest the proceeds as set forth in said paragraph. As reformed the paragraph will read as follows: " The Trustee is hereby authorized to sell all the stocks, bonds and other securities described in Schedule A and such as may be added thereto and to invest and reinvest the proceeds thereof in such stocks and bonds or other securities as it may deem best, without limitation to securities of the kind in which trust funds are permitted by law to be invested."

That does not mean that the trustee was bound, as a matter of law, to sell the bank stock, in whole or in part, immediately. It does mean that the trustee was to use reasonable diligence in disposing of the deposited securities, diligence with respect to the time of sale and the quantity of stock to be sold at any one time. Some of the facts which, among others, may have to be considered in this connection are the condition of the market generally, the character of the stock, the amount of stock to be disposed of, the condition of the market in the particular stock, how the stock was held generally, the intrinsic worth of the shares, and the financial condition of the banks involved.

The plaintiff is entitled to a reformation of the trust agreement and to an accounting, in accordance with the foregoing determination, and judgment is directed accordingly

Submit findings of fact, conclusions of law and interlocutory judgment on notice.