Vast Voorhis, J.
The general guardian of Jerome M. Ahrens, Jr., has appealed from a Surrogate’s decreé of judicial settlement of an account, and amended account, filed by the executors and trustees under the will of his grandmother, Carrie Ahrens, deceased. Jerome M. Ahrens, Jr., has come of age since the appeal was taken, and now appears through the same attorney who formerly represented Ethel Ahrens as his general guardian. These proceedings were instituted by a petition by the general guardian for a compulsory judicial settlement. The will of Carrie Ahrens names her said grandson as remainderman under a trust after the death of his father who is the life beneficiary.
A motion was made to dismiss this proceeding, in 1945, on the ground that the Surrogate’s Court lacked jurisdiction to inquire whether the conduct of the trustees, in purporting to terminate the trust on November 29, 1939, was within the scope of the power conferred upon them by Carrie Ahrens’ will. If the corpus of the trust had been exhausted by valid invasions of the principal paid to Ahrens, Sr., during his lifetime, the trustees would not be accountable to Ahrens, Jr. That motion was denied upon the ground that it was a question of fact whether the trustees had exercised the power to terminate in their honest judgment and in good faith (Matter of Ahrens, 185 Misc. 427, affd. 269 App. Div. 977). A decree subsequently entered after a trial, determining that the trust had been ended in good faith during the lifetime of Ahrens, Sr., was reversed by this court on the law and the facts in Matter of Ahrens (272 App. Div. 472) and it was held that the termination of the trust was invalid inasmuch as, in doing so, the trustees exacted concessions from the life beneficiary for their own personal advantage.
' The proceeding was remitted to the Surrogate by an order directing the trustees to restore to the trust thirty-five shares of stock of E. Regensburg & Sons, Inc., which constituted the chief asset of said trust, subject to certain equities and to a stockholders’ agreement to which decedent was a party. The Surrogate was further directed to conduct an accounting, obtain jurisdiction of all necessary parties, and take proof for the purpose of determining the amount of the aforesaid equitable liens and credits and the persons entitled thereto.
*591 After the decision by this court on the second appeal, and before the filing of their account and amended account, the executors and trustees themselves petitioned for a voluntary, judicial settlement, and the voluntary and compulsory proceedings were consolidated by order of the Surrogate.
The necessary additional parties were brought in, objections were filed, some new evidence was taken and the evidence upon the former hearing was reintroduced, but the Surrogate did not direct that said shares of stock be restored to the trust, and determined, as he did upon the former hearing, that the trustees had properly and validly exercised the discretion vested in them to terminate the trust by paying over the entire trust estate to Jerome M. Ahrens, Sr., in his lifetime. The Surrogate again held that restoration of said thirty-five shares of stock of E. Regensburg & Sons, Inc., to Carrie Ahrens’ testamentary trust was therefore unnecessary, and made no determination of the equitable credits or liens thereon.
The general guardian of Jerome M. Ahrens, Jr., was his mother, Ethel Ahrens, the first wife of Jerome M. Ahrens, Sr., who divorced him under a decree which became final March 21, 1938. One of the new parties who was brought in after the first hearing, is the executrix and sole beneficiary under the will, of Ahrens, Sr. She was his second wife, to whom he was married in May, 1941. They had no children. She has remarried since his death in 1944, and is now Catherine E. Piltz.
The opinion of the Surrogate correctly states that the former decision is not conclusive upon the executrix of Jerome M. Ahrens, Sr., but the new evidence upon the second trial strengthens rather than weakens the conclusions previously arrived at by this court.
In order to weigh the new evidence, and to rule upon appellant’s objections filed to the account and amended account of the executors and trustees, it is necessary to review the history of these transactions.
The testatrix, Carrie Ahrens, died April 25, 1938, leaving a will executed March 17, 1937, which gave her residuary estate in trust, the income to be paid to her son, Jerome M. Ahrens, during his lifetime, with remainder to his children. Jerome M. Ahrens, Jr., is his only child. The trustees were empowered in their discretion to invade the principal, by paying over to her son at any time, or from time to time, the whole or any part thereof.
After transferring to Jerome M. Ahrens his mother’s household effects, jewelry, some cash and other property, the trustees *592 purported to elect to terminate the said trust on November 29, 1939, by transferring to him the balance of the trust assets, including the said thirty-five shares of capital stock in E. Regensburg & Sons, Inc., valued in Schedule F of the amended account at $157,001.60. The 1938 book value thereof was stipulated to have been $158,390.31. The total value of capital assets delivered to Mr. Ahrens, at all times, is shown in said schedule at $177,579.54. Actually, the record shows that at other times he received an additional $11,292.54 in cash, which is important only in passing upon other objections by appellant than the one now under consideration.
Simultaneously with the transfer of the balance of these assets in this trust to Jerome M. Ahrens on November 29, 1939, he executed an inter vivos trust agreement which had been prepared by Arthur B. Hyman, a member of the law firm which was general counsel for E. Regensburg &, Sons, Inc., that purported to transfer the said thirty-five shares to Mortimer Regensburg and Ahrens as cotrustees. At the same time, the stock certificate was indorsed by Ahrens and retained by Hyman, who delivered it to Mortimer Regensburg in whose safe deposit vault, it afterwards remained. The said inter vivos trust agreement was to. continue, according to its terras, during the natural lives of Mr, Ahrens and of his son Jerome M. Ahrens, Jr. Respondent Catherine E. Piltz could have no interest in said trust, according to its terms, on account of her remarriage since Jerome M. Ahrens’ death.
On March 16,1942, Ahrens, Sr., individually, signed an option agreement covering said thirty-five shares in E. Regensburg & Sons, Inc., running to his uncles Mortimer Regensburg, Melville Regensburg, Isaac Regensburg and Bellette Regensburg, and the corporation E. Regensburg & Sons, Inc., whereby in consideration of the. sum of $13,000, payable over a period of two. years, they were given that length of time in which to elect to purchase said stock for $120,000, to be paid during an additional period of approximately two and one-half years after the exercise of the option. Mortimer Regensburg could not, of course, enter into an agreement for the purchase of stock from himself as a trustee, so that, apparently for that reason, he and Ahrens as trustees under the living trust simultaneously indorsed and delivered, the stock certificate to. Ahrens individually, in ostensible exercise of a power of cancellation given to the trustees by article XIII of the inter vivos trust agreement. During the two years ensuing after the making of this agreement, the *593 sum of $12,999.98 was paid to Ahrens by the Regensburg brothers for the purpose of keeping the option alive, and after it was exercised additional sums aggregating $39,390 were paid by them, or their wives as their assignees, to Ahrens, Sr., or to his executrix after his death which occurred on October 14,1944. A total sum of $52,389.98 has been paid to date, including the consideration paid for the option which was to apply upon the purchase price.
Further facts are stated in the opinion of this court at 272 Appellate Division 472, which need not be repeated, except to refer to the circumstance that two of Carrie Ahrens’ three executors and trustees (Mortimer and Melville Regensburg) were indebted to the corporation for personal loans in excess of $1,130,000, and were liable to repay an additional $2,100,000 that had been advanced to their brothers Isaac, Bellette and J ef ome Regensburg, who were also directors. Mortimer Regensburg was president of the corporation in 1939, at a salary of $50,000, and Melville was secretary at a salary of $35,000. Isaac received a salary of $50,000 and Bellette was paid $35,000. It appears that they had given notes to the corporation for these loans, pledging their stock as collateral security. The outstanding capital stock was 1,000 shares. The testatrix, Carrie Ahrens, a sister of the Regensburgs, did not participate in these loans or overdrafts, which must have reduced or prevented her dividends. At the time of her death, her thirty-five shares were the only free shares of stock in the corporation, with the possible exception of thirty-five other shares which were acquired by the Regensburg brothers in 1939 and 1940. When asked by appellant’s counsel: “ So this 35 shares of stock represented by certificate No. 37 [Ahrens’ stock] in the possession of your attorney is the only unencumbered stock of the company * * *? ”, Mortimer Regensburg, replied: “ Well, that might be.” This makes it difficult to dismiss lightly, as the Regensburgs do, these thirty-five shares of Carrie Ahrens as of lesser value, due to representing a minority interest of 3.5% in a closely held business corporation that had made loans but was not paying dividends.
Jerome M. Ahrens worked for the Regensburg corporation at a salary of $8,000 per annum. If Mortimer and Melville Regensburg, as trustees under the will of Jerome Ahrens’ mother, had used their discretionary power to invade the principal by transferring these shares to him unconditionally — as the records of both first and second trials show unequivocally that he wanted —> *594 the situation might have developed into one where his uncles would have been working for him instead of his working for his uncles. Jerome Ahrens smarted under what he regarded as the injustice of his not being paid more than $8,000 in salary. He was aware that unfettered ownership of his mother’s stock would give him an important bargaining advantage in this and other affairs of the corporation. His uncles were aware of this fact also and were as fully determined that he should not have it. An illustration of this is contained in the letter of July 21, 1939, to Jerome from the attorney for Mortimer and Melville Regensburg and his associate Zimmerman as trustees, which criticized Jerome’s “ insistence upon retaining the stock irrespective of any question of the management of the company or its effect upon its assets ” (Petitioner’s Exhibit 1, first trial).
After it had been established that two of the three trustees under Mrs. Ahrens’ will were in a position where they would normally be obliged as fiduciaries to sue themselves as officers and directors, the duty rested upon them under well-established principles of law to presént an explanation showing that their conduct was disinterested and right. The burden of going forward with evidence that they acted in' bad faith in terminating the trust was not upon appellant; it was incumbent on the trustees to take the affirmative in showing that they acted in good faith (Matter of Smith, 95 N. Y. 516, 522; Belden v. Belden, 139 App. Div. 437, 445; Matter of Ahrens, 272 App. Div. 472, supra). If the testimony which was introduced by respondents is unconvincing and improbable, their burden was not sustained even if,-in some respects, it was not contradicted by direct evidence offered by appellant.
On the last appeal we ruled that the trust under Mrs. Ahrens’ will was not validly terminated in ‘ ‘ that the circumstances point strongly to the conclusion that he [Jerome Ahrens] was dealing with his uncles on a basis of mutual self-interest, and that they invaded the corpus as a result of a bargain between them.” (P. 479.) Invading the principal on such a basis was outside of the power contained in the will (Pyle v. Pyle, 137 App. Div. 568, affd. 199 N. Y. 538; Matter of Wentworth, 230 N. Y. 176, 182-183; Matter of Wilkin, 183 N. Y. 104; Matter of Briggs, 101 Misc. 191, 202-203, 205, mod. 180 App. Div. 752, mod. 223 N. Y. 677). The bargain referred to arose from the refusal of the Regensburg brothers to transfer to him unconditionally these thirty-five shares. After a long series of negotiations, Ahrens finally agreed to trustee this stock to himself a-nd *595 Mortimer Regensburg, which ‘ ‘ not only had the effect of hindering the commencement of a minority stockholders suit against the officers and directors of E. Regensburg & Sons, Inc., if Ahrens, Sr., would have chosen to bring one, but it also prevented him, without the consent of his cotrustee, from selling these shares to outsiders, who might have been inclined to maintain such a suit ” (Matter of Ahrens, 272 App. Div. 472, 478, supra).
However much Jerome might have deferred to his uncles’ superior business experience and acumen, they were not certain what he might do if he held the whip handle by being given absolute control of his mother’s stock, and they were taking no chances.
As was pointed out upon the former appeal, whatever obstacles were placed in the way of a derivative action against the Regensburg directors resulted in a personal benefit to two of these three trustees. If they could have succeeded in getting Jerome Ahrens to have released themselves and the other Regensburg directors, they would have transferred his mother’s thirty-five shares to Ahrens without the setting up of any living trust. It would have had the effect of depreciating the value of those shares by a very substantial amount, which depreciation would have inured to the personal benefit of two of these trustees. The legal effect would have been the same in principle, if not in form, as though the trustees had promised to invade the corpus for Ahrens ’ benefit, provided that he had agreed to pay money to two of them. It would not be contended by any one that discretionary advancements made to a fife beneficiary upon such terms fell within the power granted to the trustees by the will or were validly made. In this case, the demand was withdrawn that Ahrens release individually the officers, directors and stockholders of E. Regensburg & Co., Inc., but only in view of the less drastic procedure of his creating an inter vivos trust, which was designed to accomplish a similar object. The fact that Jerome voluntarily took the stock on those terms, signifies no more than it would have done if he had agreed to pay his trustees in some other manner for exercising their discretionary power in his favor. Prom his point of view, he was making the best deal with them that he could.
The letters in 1939, between the parties and their attorneys, undermine the protestations of respondents’ witnesses that Jerome Ahrens wanted of his own accord to tie strings to his use of his mother’s stock. Thus we find that in a letter of July 21, 1939, the attorney for the trustees was writing to Jerome Ahrens: *596 ‘1 As we understand your present position, you want the trustees to exercise the discretion given to them by Article V of your mother’s last will and testament and to turn over all the assets in your mother’s estate without setting up the trust.”
The reference was, of course, to the executors setting up the trust in his mother’s will, but it is plain enough that Ahrens had wanted outright ownership of his mother’s shares. In asking for a release, the attorney for the estate wrote:
‘ You will note that the enclosed release specifically discharges, not only the executors of and trustees under your mother’s will, but also the former and present officers, directors and stockholders of E. Regensburg & Sons, Inc. This provision is vital in view of your refusal to accept the book value in cash of the stock and your insistence upon retaining the stock irrespective of any question of the management of the company or its effect upon its assets.
‘ ‘ It is entirely within your province to request the retention of the stock and we personally see no reason why the same should not be turned over to you. However, it is not our intention to advise the executors and trustees to turn over the stock to you which might carry with it a possible law suit as an incident of your ownership thereof. In other words, you cannot have your cake and eat it. * * * we cannot close our eyes to the fact that two of the executors and trustees whom we do represent are now and always have been stockholders, officers and directors of E. Regensburg & Co. Inc. and if we were to accept from you a release of our clients solely in their capacity of executors and trustees, it would be but indifferent representation for which this firm might ultimately be held accountable.”
In order to avoid any subsequent contention that such a release from Ahrens would fail of its effect due to lack of knowledge of the facts on which liability of these directors was based, this letter continues by insisting that Ahrens meet with the accountant for the corporation at an appointed time, that he inspect “ any and all books and records of the corporation that you may care to examine ”, and ask whatever questions he might desire.
We are unimpressed by the repudiation by Mortimer and Melville Regensburg of authority in their attorney, Mr. Uniacke, the author of the foregoing letter, to ask for such a release, or to lay down any terms or conditions on the basis of which this stock was to be turned over to Ahrens.
The record of the second trial contains for the first time the reply on behalf of Ahrens to Uniacke’s letter of July 21, *597 1939. Dated August 14th, this reply was written by Ahrens’ friend and legal adviser, Alexander Ackerson, and copies of it were mailed by Ahrens personally to his uncles Mortimer and Melville and to the third trustee under his mother’s will, David M. Zimmerman. This letter certainly supports the statement in Uniacke’s letter to Ackerson of July 25, 1939, that “ The necessity for the release is brought home to me very definitely as a result of my talk with you yesterday.” Ackerson makes clear that what Ahrens wanted was absolute title to these shares, unincumbered by a trust of any kind. He wrote: “ It is Mr. Ahrens’ suggestion, that this situation, besides other considerations, renders the setting up of the Trust unnecessary and inadvisable, and that the entire remaining residuary estate, including the 35 shares of stock in E. Regensburg & Sons, Inc., should be turned over and delivered to him, in the same manner and to the same effect as if such assets had been directly bequeathed and devised to him by his Mother, without the intervening trust provisions contained in her Will. This can be accomplished readily, by the exercise of the discretion reposed in the Executors and potential Testamentary Trustees, under the Will and can give rise to no criticism whatever, and avoids any requirement for the sale of any of said assets * * *. This procedure would be similar to that adopted by the Executors and potential Testamentary Trustees in turning over to Mr. Ahrens all of the household furniture and effects left by his Mother (the Decedent) as part of her residuary estate.” The letter objects to the trustees giving any thought ‘ ‘ to the interests of the Directors, Officers and Stockholders of that firm [E. Regensburg & Sons, Inc.], as such, although not involved in the Estate ’ ’, and reminds Mr. tlniacke’s firm that.a charge of “ indifferent representation ” in the then existing situation had no relation to their capacity as attorneys for the estate of Ahrens’ mother. Ackerson’s letter refers specifically to the reference in Uniacke’s letter to Ahrens’ alleged “ refusal to accept the book value in cash of the stock ”, stating: “ At no time, in any of the conversations had with Mr. Uniacke or with Mr. Zimmerman, was any offer made for the payment of any sum to Mr. Ahrens, either as the value or proceeds of any stock, or otherwise, and your said statement is doubtless inadvertent.” He complains of the willingness of the trustees “ to distribute the remaining residuary assets of the Estate, conditionally ’ ’, and mentions the giving of the release as a “ counter-proposition ” to setting up the trust under the will.
*598 Uniacke’s letter of July 25th expressed displeasure to Ackerson that “ Yesterday you limited the quantity and quality of your examination and inspection ” of the Regensburg corporation’s books. Ackerson perceived the point, and pressed his advantage, answering with tongue in cheek that examination was unnecessary since Ahrens’ confidence in his uncles was so great that he would not be surprised to learn that the ‘ ‘ Collateral Loans ” were “ made against the security of United States Government Bonds or similar adequate collateral.” He continued writing that it is “a complete mystery why this subject was injected into the situation ”, and that “ It is likewise beyond comprehension, why or how a possible law suit might accrue or arise incident to the ownership of the said 35 shares of stock by Mr. Ahrens, nor what is meant by your statement: ‘ you cannot have your cake and eat it ’, as set forth in your letter of the 21st ult.” Writing in this vein, Ackerson could hardly have forgotten that what he had told Uniacke on July 24th had been put forward by the latter as establishing the necessity for a release from Ahrens to the Regensburg officers, directors and stockholders. However — and this is the main point of Ackerson’s letter — “if the said remaining residuary assets of the Estate, including said 35 shares of stock, are not turned over and delivered to him before you file the Executors’ Final Account in the Surrogates’ Court, Mr. Ahrens will reluctantly be compelled to (and must, as you will agree) retain the best available lawyer to protect his rights and interests and be guided by his advice. * * * This letter is written without prejudice to any rights or remedies of Jerome M. Ahrens in the premises, and without in anywise limiting any of the same or any contentions which he might, may, shall, could or can make, inconsistent herewith or any part thereof, or otherwise.”
Uniacke answered this letter on the day following its receipt, stating: “ I want you to know that I consider myself relieved from any further effort to have the executors refrain from setting up the trust. Since your letter of August 14th concerned itself solely with efforts to induce the executors to refrain from setting up the trust, and since that phase of the situation is no longer in my hands, I do not feel called upon to reply to your letter, other than to say that I.am very glad that Mr. Ahrens has at last seen fit to follow my advice and bring his own attorney into the case.”
Mr. Ackerson’s testimony, upon the second trial, is something less than convincing that a possible stockholder’s derivative action entered into no conversations in which he participated *599 with the representatives of the Carrie Ahrens estate. Equally unconvincing is the testimony of the other witnesses to similar effect.
The two principal arguments on behalf of respondents arising from the second trial are that there is testimony that the trustees offered to have these shares purchased at book value by the company subject to the order of the Surrogate, but that they were deterred from doing so because Ahrens objected and wanted the stock himself; and that Ahrens harbored no intention at any time to bring a stockholder’s suit. These positions are not entirely consistent, since the main reason on account of which Ahrens wanted the stock, without strings attached, was the power which it would have given him over the corporation. If the trustees offered to apply to the Surrogate for approval of a sale of these shares at their book value, which Ackerson denied in his letter to Uniacke of August 14, 1939, the fact is that they never made such an application. It appears that as executors or trustees they signed a proposed account of proceedings in the estate of Carrie Ahrens about the middle of August, 1939, which, for some reason, was never filed in the Surrogate’s office. In Schedule K thereof (Respondents’ Exhibit 7-A, first trial) these trustees stated concerning the thirty-five shares left by Carrie AJirens: “ None of the stockholders, directors and officers are at this time willing to purchase the stock of the company held by the estate. The company, however, has indicated a willingness to acquire said stock, at its book value, but owing to the interrelationship of all the parties, has refused and still refuses to negotiate a purchase of said stock unless and until the executors and trustees of the estate of Carrie Ahrens, deceased, have obtained from the court an order authorizing and empowering them so to do pursuant to the law in such case duly made and provided.”
That is, of course, what should have been done, and the principal effect of this exhibit is to show that the executors and trustees knew it at the time. It is no answer to say that they failed to proceed because Jerome M. Ahrens did not wish them to do so. Perhaps it is something less than fair, at this date, to lay the blame upon Mr. Ahrens for the fact that these shares were not purchased under the stockholders ’ agreement at book value; but even if the Regensburgs did make such an offer, the opinion or wishes of the beneficiary of a spendthrift trust cannot be adduced to relieve the trustees of their responsibilities.
The contention that Ahrens never would have commenced a stockholder’s suit, so that the trustees as individuals would have *600 had no motive in guarding against it, is not persuasive. If Ackerson faithfully represented him (and there is no reason to believe that he did not), then, judging from the correspondence, the possibility was very real. On the second trial, Ackerson testified that Ahrens told Uniacke ‘ ‘ that he had been unable to urge his advancement' [in E. Eegensburg & Sons, Inc.] because of the fact that he didn’t have possession of the stock ”, and that he told Uniacke and Zimmerman that “ the original intention of his mother, Carrie Ahrens, as Mr. Zimmerman knew, was to leave him in full control of all the assets of her estate, including the 35 shares of stock of E. Eegensburg & Sons.” That does not reflect a spontaneous desire to trustee this asset to his Uncle Mortimer. Ahrens’ aversion to this living trust is again demonstrated by his letter of March 3, 1941 (Piltz Exhibit 5, second trial), retaining a firm of attorneys, at a commission of 10%, to negotiate with his Uncle Mortimer in an endeavor to' sell this stock “ free of the provisions of said trust ”. If these attorneys failed to accomplish this, they were nevertheless to be paid by Ahrens “ should my salary, inclusive of bonus, with E. Eegensburg & Sons, be increased above eight thousand dollars ($8,000) per year ”.
If these trustees, in invading the principal, had made an absolute assignment of these thirty-five shares to Mr. Ahrens, it would have been difficult to have questioned their power to do so under the will. That is what Ahrens wanted, but was what the Eegensburgs were unwilling to do. There is no question in this case of the honesty of Mr. Ahrens’ purposes. His mother’s shares were constantly dangling before his eyes, but, whenever he tried to get them they were kept out of his reach. Mortimer Eegensburg testified: “ He didn’t have a free hand when I was a trustee with my brother and another trustee, but with he and I as trustees alone he thought he would have easier handling.” But it was not to be, for he found the trump cards always in his uncles’ hands.
Carrie Ahrens’ trustees were not in the position envisaged by the Surrogate. They had several alternatives, the fairest and best of which was for them to have arranged to have purchased these shares at book value under an order of approval by the Surrogate, pursuant to the stockholders ’ agreement, which they evidently, at one time, planned to do. This stockholders’ agreement need not be further mentioned since its effect is discussed in the former opinion (272 App. Div. 472, appeal dismissed 297 N. Y. 600). It was referred to in Mrs. Ahrens’ will, indicating *601 that her thought was that it would be carried out. It should have been carried out, under threat of litigation if necessary, since the decedent had not participated in these large withdrawals from the corporation. The right to sue, which pertained to her shares of stock, was a just right, and was needed to redress the balance between her and her brother stockholders.
On the second trial, evidence was introduced that thirty-five other shares were purchased by the Regensburg brothers for $120,000 in 1939 and 1940. They paid cash for that stock, which they did not control as fiduciaries. It is urged that this establishes that the taking of an option at the same price for two years on the Ahrens ’ shares in 1942, with payments extended over two and a half years more ($52,389.98 having been paid thereon to date), represented a purchase at the market value. This conclusion does not follow. It does not appear whether the other shares were encumbered by loans prior to their sale to the Regensburgs, nor whether the owners were conversant with the facts respecting the overdrafts, nor what were the circumstances. Although subject to a duty to make full and fair disclosure to the court of the surrounding facts and circumstances, no financial or income statement was produced of E. Regensburg & Sons, Inc.
The argument that the trustees were moved by compassion for Mr. Ahrens’ personal or financial difficulties would be more convincing if they had paid what the shares were worth and what his mother evidently expected that they would bring. The practical alternative should have been a $3,200,000 minority stockholder suit.
Much has been said for respondents about the good fortune which befell Jerome M. Ahrens, Jr. It is said that not only did his grandmother, Carrie Ahrens, create a living trust of $50,000 under which Ahrens, Jr., became entitled to the remainder, but that she also provided for him by a separate $10,000 trust in her will, and his father erected a $29,000 life insurance trust for him. But the circumstance that he was thus favored by fortune and the good will of his father and grandmother, is not a reason on account of which the Regensburgs should pay less for these shares.
To the extent that the trustees paid or transferred to Jerome M. Ahrens, Sr., other assets than the thirty-five shares of Regensburg stock, it is held that they did so in pursuance of the power contained in Carrie Ahrens ’ will. On the other hand, by exacting a benefit for themselves as a condition of assigning to him the *602 thirty-five shares of Regensburg stock in requiring the creation of the inter vivos trust, with Mortimer Regensburg as cotrustee, they exceeded their power to invade the principal contained in the will. Their act in doing so was unauthorized, and, subject to equities, is to be regarded as not having taken place (Matter of Ahrens, 272 App. Div. 472, supra; see also cases cited in the opinion of the Surrogate herein at 185 Misc. 427, affd. 269 App. Div. 977).
In considering what equitable adjustments should be made, it is necessary to trace what subsequently occurred. Even if the transfer of these thirty-five shares by the trustees to Ahrens, Sr., were held to be valid, .the question would remain whether the inter vivos trust which he simultaneously created was ever terminated. If it had a valid inception and was not terminated, any income would go to Ahrens, Jr., and the principal, upon his death, to Ms issue. Power of cancellation was granted to the two trustees, but such power could not be exercised in order to enable one of the trustees to participate in buying the assets of the trust from the other, who was the beneficiary (Matter of Wentworth, 230 N. Y. 176, supra).
The equitable liens which have been referred to, that are to come into existence upon the restoration of this stock to the Carrie Ahrens ’ testamentary trust, have resulted from payments made upon a contract to purchase stock from Ahrens, Sr., to which he did not have title. Here, in view of the attempted exercise of the power to invade the principal for Mr. Ahrens’ benefit, it is equitable and proper to treat such moneys as were actually paid to him in his lifetime, under this purchase agreement, as advancements of principal to him from the trust under his mother’s will. That result will be accomplished by charging such payments as liens upon these thirty-five shares on their being restored to the trust. This disposition eliminates any surcharge for these equitable liens against the executors and trustees of Carrie Ahrens. No such liens can be recognized, in the case of the payments made on this contract to his executrix after Mr. Ahrens’ death. Those payments cannot be traced as though they were invasions of principal for Ahrens’ benefit. Such payments were made to Ahrens’ executrix by Sophy Regensburg and Estelle Regensburg, and their answers raise no issue upon this point between themselves and Ahrens ’ executrix.
The amount of such liens against said tMrty-five shares upon their restoration to the trust is, therefore, $32,999.98, to be apportioned as follows:
*603 To Estate of Isaac Regensburg $3,250.00
To Estate of Bellette Regensburg 3,250.00
. To Sophy P. Regensburg, individually and as as assignee of Melville E. Regensburg 13,249.99
To Estelle K. Regensburg, individually and as assignee of Mortimer Regensburg 13,249.99
The other objections by appellant are all disallowed, except that commissions to the executors and trustees of Carrie Ahrens are denied, and the amount of $10,146.76 paid to Mortimer Regensburg and Melville Regensburg for that purpose ordered refunded to the trust. No commissions were charged by David M. Zimmerman, the sum of $5,073.38 charged to him having been paid to Jerome Ahrens, Sr., and credited to the trustees as a legitimate advancement of principal from the trust. The items of $3,376.14 and $7,916.40 were properly credited to themselves by the executors and trustees, representing payment of estate taxes imposed on Carrie Ahrens’ estate by reason of property held jointly by Jerome M. Ahrens and Carrie Ahrens, and the living trust created by Carrie Ahrens for $50,000. Although reimbursement was made, in each instance, of the amounts so apportioned against the joint property and the Carrie Ahrens’ living trust, such reimbursements were paid directly to Jerome M. Ahrens instead of passing to him through Ms mother’s executors and trustees. These reimbursements are properly treated as legitimate advancements of principal to Jerome M. Ahrens.
The decree appealed from should be modified in accordance with this opinion, the finding of fact contained in the Surrogate’s opinion reversed that the Carrie Ahrens’ testamentary trust was terminated by her executors and trustees in good faith, and new findings of fact made in accordance with this opinion, with costs to appellant, and respondents out of the fund.
Dore and Shientag, JJ., concur; Glennon, J. P., and Callahan, J., dissent for the reasons stated heretofore in 272 App. Div. 472, 480.
Decree modified in accordance with the opinion herein, the finding of fact contained in the Surrogate’s opinion reversed that the Carrie Ahrens’ testamentary trust was terminated by her executors and trustees in good faith, and new findings of fact made in accordance with said opinion, with costs to appellant and respondents payable out of the fund. Settle order on notice.